CERTIFIED COPY

A True Copy
Teste:



Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

# In the
# United States Court of Appeals
## For the Seventh Circuit

---

No. 10-1665

MERCATUS GROUP, LLC,

*Plaintiff-Appellant,*

*v.*

LAKE FOREST HOSPITAL,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 cv 2042—**Blanche M. Manning**, *Judge.*

---

ARGUED NOVEMBER 4, 2010—DECIDED MAY 26, 2011

---

Before BAUER, MANION, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* The First Amendment of the Constitution states that Congress shall make no law abridging the "right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Under the *Noerr-Pennington* doctrine, federal antitrust laws have been interpreted to protect these First Amendment rights by immunizing petitioning activity from liability. In this appeal from the district

court's grant of summary judgment for defendant-
appellee Lake Forest Hospital, we must decide
whether that doctrine shelters from antitrust liability
one competitor's alleged misrepresentations about
another made during and in relation to local zoning
proceedings. We conclude that it does. Because nothing
else in the record is sufficient to make out a claim
for liability under the antitrust laws, we affirm.


I.  *Background*

In 2004, plaintiff-appellant Mercatus Group, LLC, began
plans to construct a physician center—essentially, a
medical office building from which physicians can provide
medical services—in the Village of Lake Bluff, Illinois.
Mercatus sought to build this center on a plat of land
occupied at that time by an automobile dealership (the
"Shepard Land"). Mercatus' partner in this venture
was Evanston Northwestern Healthcare ("ENH"), with
which Mercatus planned to construct a number of such
physician centers.

Appellee Lake Forest Hospital (the "Hospital") is
located in nearby Lake Forest, a short distance from
the Shepard Land. The Hospital recognized the "huge
threat" that the proposed Mercatus Lake Bluff center
posed to its ability to compete in the local market for
medical services. To protect itself from this threat, the
Hospital launched a multi-pronged campaign designed
to prevent Mercatus from opening the physician center.
First, the Hospital lobbied members of the Lake Bluff
Board of Village Trustees—both individually and at a

No. 10-1665                                                              3

number of public Village Board meetings held on this matter—to deny Mercatus the approvals necessary to begin construction on the Shepard Land. Second, the Hospital launched a public relations campaign encouraging Hospital employees and donors, as well as the local community, to put political pressure on the Village Board to oppose the Mercatus center. Third, the Hospital told ENH to stay out of Lake Bluff and made a number of derogatory statements about Mercatus to ENH and other healthcare providers. Finally, the Hospital identified two Hospital-affiliated physician practice groups that planned to move their practices to the new Mercatus physician center and offered those groups various incentives not to do so.

The Hospital's efforts were successful. Both physician practice groups pulled out of their conditional agreements with Mercatus, the Village Board denied Mercatus the approvals necessary to develop the Shepard Land, and ENH terminated its business relationship with Mercatus. Mercatus never opened a physician center in Lake Bluff.

Mercatus brought this suit in federal district court, alleging in relevant part that the Hospital had monopolized and/or attempted to monopolize alleged markets for "comprehensive physician services" and "diagnostic imaging services" in eastern Lake County, Illinois, in violation of the Sherman Act, 15 U.S.C. § 2.[1] On the

---

[1] Mercatus' amended complaint defines "diagnostic imaging services" as "magnetic resonance imaging, computerized

(continued...)

Hospital's motion, the district court dismissed some of Mercatus' claims against the Hospital for failure to state a claim. *Mercatus Group LLC v. Lake Forest Hosp.*, 528 F. Supp. 2d 797 (N.D. Ill. 2007) ("*Mercatus I*"). Mercatus filed an amended complaint and, following extensive discovery, the district court granted the Hospital's motion for summary judgment on that amended complaint. *Mercatus Group LLC v. Lake Forest Hosp.*, 695 F. Supp. 2d 811 (N.D. Ill. 2010) ("*Mercatus II*"). The district court concluded that the Hospital's efforts before the Village Board were protected from antitrust liability by the First Amendment right to petition the government for the redress of grievances. *Id.* at 818-21. As for the Hospital's other conduct, the court held that what it characterized as mere misrepresentations and disparaging comments were, as a matter of law, insufficient to give rise to antitrust liability. *Id.* at 823; see also *Mercatus I*, 528 F. Supp. 2d at 810 (dismissing part of original complaint on similar grounds).

On appeal, Mercatus first argues that the Hospital's petitioning conduct relating to the Village Board meetings

---

[1] (...continued)

tomography, nuclear medicine, radiography, and ultrasonography, sold to patients" and "comprehensive physician services" as "business services such as billing assistance, clinical services such as on-site diagnostic imaging services, and real estate services, such as leasing space to physicians." We do not address in this appeal the viability of plaintiff's proposed product and geographic market definitions.

No. 10-1665                                                  5

is not protected by the First Amendment because the Hospital made a number of misrepresentations that altered the outcome of those meetings. Mercatus argues in the alternative that the Hospital's other conduct—its public relations campaign, its communications with ENH and other healthcare providers, and its efforts to convince the physician practice groups not to relocate their practices to Mercatus' physician center—violated the Sherman Act even if the Village Board proceedings are disregarded.

We affirm. Even if we assume that the Hospital made material misrepresentations during and relating to the Village Board proceedings concerning Mercatus' physician center, such misrepresentations are legally irrelevant because those meetings were inherently political in nature. The same is true of the Hospital's public relations campaign, which was inextricably intertwined with the Hospital's efforts before the Board. As for the Hospital's contacts with ENH and other healthcare providers, those contacts constituted mere speech that was not actionable under the Sherman Act. Finally, no reasonable trier of fact could conclude from this record that the Hospital's successful effort to convince physicians not to relocate their practices to Mercatus' proposed physician center constituted predatory conduct forbidden by the antitrust laws.

II.  *Standard of Review*

We review de novo the district court's grant of summary judgment. *Omnicare, Inc. v. United Health Group,*

*Inc.*, 629 F.3d 697, 705 (7th Cir. 2011). Summary judgment is appropriate when the pleadings and submissions in the record indicate the absence of any genuine issues of material fact, such that the moving party is entitled to judgment as a matter of law. *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995). Because Mercatus opposed summary judgment, we draw all reasonable factual inferences from the record in Mercatus' favor. *Jakubiec v. Cities Service Co.*, 844 F.2d 470, 471 (7th Cir. 1988). We will affirm only if, viewing the record in such a favorable light to Mercatus, no reasonable jury could have rendered a verdict in Mercatus' favor on any of its claims. *Wilson v. Williams*, 997 F.2d 348, 350 (7th Cir. 1993).

In evaluating multiple claims under these standards, we recall that a plaintiff "should be given the full benefit of [its] proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). That does not mean, however, that we will aggregate the effects of conduct immunized from antitrust liability with the effects of conduct not so immunized. That approach would nullify the immunity. For that reason, we must first identify any conduct that is immunized. After we do so, we consider the evidence of the remaining challenged conduct in the aggregate to see if it is sufficient to support antitrust liability.

III.  *Lobbying the Village Board—the Noerr-Pennington Doc-*
      *trine*

Mercatus' primary argument on appeal is that the
Hospital's conduct in the Village Board proceedings
is not protected by the First Amendment. This, Mercatus
argues, is because the Hospital allegedly made numer-
ous misrepresentations and material omissions of fact
to the Village Board that ultimately caused the Board to
deny Mercatus permission to begin construction on the
Shepard Land.

A.  *Facts on Summary Judgment*

Mercatus first appeared before the Village Board at
an April 2006 board meeting, at which time Mercatus
made an informal pre-filing presentation of its pre-
liminary plans for a physician center on the Shepard
Land. Mercatus representatives argued that the physician
center would be "a good project for the community
of Lake Bluff." The Village Board also heard from the
Hospital's outgoing president, Bill Ries, who claimed
that the Mercatus physician center would not be good
for the community because it would extract "the most
profitable outpatient services" from local hospitals. Ries
also questioned Mercatus' commitment to charitable
medical care and claimed that the Hospital "commit-
ted over $25 million in subsidy and charity to the
people of Lake County," representing "nearly 13 percent
of our net revenue." Village Board trustee Michael
Peters, a physician at the Hospital, also expressed

concern that the Mercatus plan might jeopardize the Hospital and could lead to higher healthcare prices.

In September 2006, the Lake Bluff Architectural Board of Review reviewed the proposed site plan for the Mercatus physician center. The Architectural Board recommended approval of the site plan, which was then taken under consideration by the Village Board. According to Lake Bluff ordinances, only a vote by two-thirds of the Village Board could overturn the Architectural Board's site plan approval. At the Village Board's October 2006 meeting, however, Lake Bluff's attorney informed the Village Board that, in addition to site plan approval, Mercatus needed separate Village Board approval even to develop the Shepard Land. As he explained, a special use ordinance had been applicable to the Shepard Land since 1972. That ordinance "specially classified" the Shepard Land "for usage as a new retail automobile . . . facility." Any "new uses or different uses" were to be "submitted to the [Village Board] for a public hearing to ascertain whether the same will be approved." The 1976 and 1979 amendments to the ordinance reaffirmed that any proposed future development or use of the Shepard Land required Village Board approval. Mercatus' attorney attempted to convince the Board that the ordinance and its amendments did not require a separate vote on development approval, but to no avail. The Village Board elected to consider the issue of development approval separately before addressing the issue of site plan approval.

No. 10-1665                                                9

Representatives of Mercatus and the Hospital both made statements to the Village Board regarding development approval. On behalf of Mercatus, Bill Maggard argued for approval because the physician center would "provide[ ] new solutions to the healthcare crisis by eliminating inefficiencies in healthcare." He also argued that the Hospital "doesn't have a monopoly on providing healthcare services to the community" and pointed out that the Mercatus agreement with ENH obligated it to provide charity care.

In response, Hospital CEO Tom McAfee pointed out that the Hospital is a not-for-profit charity and voiced concern that Mercatus would "cherry pick the most profitable services out of communities for for-profit venture backed operations at the expense of community healthcare providers." If the Mercatus project went forward, McAfee estimated, it would cost the Hospital "at least $2 million a year in lost bottom line." He added that "millions of dollars [for] this hospital is nurses at the bedside" and "literally [risked] the survival of the institution." McAfee also noted that Mercatus' partner ENH was being investigated by the FTC for anti-competitive activities. In sum, he said, "enabling Mercatus to develop a facility that will compete with the hospital . . . will not advance the healthcare needs of this community. It will definitely damage them."

After further statements by the Hospital's CEO and a number of Hospital physicians who opposed the Mercatus project, as well as from some local citizens who spoke out in favor of the project, Village Board

trustee Dr. Peters again expressed concern that the Mercatus physician center could have a negative impact on the Hospital. Dr. Peters also speculated that Mercatus would ultimately raise prices, noting that the FTC had found Mercatus' partner ENH "guilty of raising prices" in 2005. The Board then voted to approve the development of the Shepard Land but deferred its vote on site plan approval to its November meeting.

At the Board's November meeting, however, the Board voted to reconsider its grant of development approval. The Board then tabled the matter to its January meeting. At that meeting, Hospital CEO McAfee again voiced his belief that the Mercatus physician center would "remove millions of dollars" from the Hospital, which "simply [did not] have the resources to defend [itself]." With Dr. Peters abstaining, the Board then unanimously voted to deny development approval. The Board also denied site plan approval.


B.  *The Noerr-Pennington Doctrine*

In its amended complaint, Mercatus claimed that the Hospital should be held liable in antitrust because it drastically misrepresented, among other things, the extent to which the Mercatus physician center would harm the Hospital. In its amended complaint, Mercatus alleged that the Hospital lied when it claimed that the Mercatus center would "cause a $2 million loss to [the Hospital], drive the Hospital out of business, and

prevent [the Hospital] from providing charity care." For purposes of this decision only, we will assume that all of the statements challenged by Mercatus were in fact false.[2]

In granting summary judgment against Mercatus on this claim, the district court held that any misrepresentations to the Board were immunized from antitrust liability under the *Noerr-Pennington* doctrine. *Mercatus II*, 695 F. Supp. 2d at 818-21. This doctrine takes its name from *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) (holding that railroads' publicity campaign to promote support for laws harmful to trucking interest was immune from antitrust liability), and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965) (joint efforts by miners' union and large coal companies to have federal agency impose higher minimum wage for coal suppliers to TVA were

---

[2] According to Mercatus, the falsity of the Hospital's claim that Mercatus posed a threat to the Hospital can be shown "by simply observing [the Hospital's] actual financial status"—the fact that the Hospital had "substantial assets including cash, stock, land[,] and buildings" as well as "substantial extra capital capacity for expansion." Mercatus also claims that the Hospital's internal notes reveal the falsity of the Hospital's claim that it provided $25 million in subsidy and charity to the community. Because, as we explain below, the alleged falsity of the Hospital's statements to the Village Board is of no legal significance in this case, we express no opinion on whether Mercatus mustered sufficient evidence to prove the falsity of the Hospital's predictive statements to the Village Board.

immune from antitrust liability). The doctrine extends absolute immunity under the antitrust laws to "businesses and other associations when they join together to petition legislative bodies, administrative agencies, or courts for action that may have anticompetitive effects." *Wilk v. American Medical Ass'n*, 719 F.2d 207, 229 (7th Cir. 1983); see *LaSalle Nat'l Bank of Chicago v. DuPage County*, 777 F.2d 377, 384 n.6 (7th Cir. 1985) (*Noerr-Pennington* doctrine "bars Sherman Act suits against persons who associate for the purpose of restraining trade and competition if they pursue this purpose through legitimate political means").

This immunity is extended "in part because the original purposes of the Sherman Act did not include regulating political activity and in part because it is questionable whether the first amendment allows such regulation." *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 371 (7th Cir. 1987). The *Noerr-Pennington* doctrine recognizes that our democratic system of government derives its very vitality from its citizens' ability to reject the status quo and to advocate for changes in the law. "The Sherman Act expresses one policy; people are free to try to persuade their representatives that monopoly is preferable. . . . The first amendment protects the right of the people to ask for this boon." *Id.*

1. *The Sham Exception to Noerr-Pennington*

Mercatus concedes that the *Noerr-Pennington* doctrine would immunize truthful statements made to the Village

No. 10-1665                       13

Board. Rather, it argues that, because a number of the Hospital's statements to the Board were false (or were so materially incomplete as to be considered false), the "sham" exception to *Noerr-Pennington* immunity should apply. The sham exception was first mentioned in *Noerr* itself, which speculated: "There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." 365 U.S. at 144. In the years since, courts have recognized two specific kinds of conduct that can trigger the sham exception: (1) sham lawsuits; and (2) fraudulent misrepresentations. See *Kottle v. Northwest Kidney Centers*, 146 F.3d 1056, 1060-62 (9th Cir. 1998).[3]

Mercatus relies on the fraud branch of the sham exception to *Noerr-Pennington*. This exception traces its origins

---

[3] The Ninth Circuit has said in dicta that the sham exception can also apply if a party brings a series of lawsuits without regard to their merits, even if a few have some merit as a matter of chance. See *Kottle*, 146 F.3d at 1060. We have not faced that issue. See *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 n.5 (1993) ("A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham."); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972) ("One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused.").

back to the Supreme Court's hint that "[t]here are many . . . forms of illegal and reprehensible practice which may corrupt the *administrative or judicial processes* and which may result in antitrust violations. Misrepresentations, condoned in the political arena, are not immunized when used in the *adjudicatory process*." *California Motor Transp.*, 404 U.S. at 513 (emphases added); see *id.* at 512 ("[U]nethical conduct in the setting of the adjudicatory process often results in sanctions. Perjury of witnesses is one example."). The Court later added that "unethical and deceptive practices can constitute abuses of administrative or judicial processes that may result in antitrust violations." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988) (citation omitted).

Although these statements were technically dicta—neither *California Motor Transport* nor *Allied Tube* involved perjury or false statements before an adjudicative or administrative body—there is little doubt that fraudulent misrepresentations may render purported petitioning activity a sham not protected from antitrust liability. See *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 124 (3d Cir. 1999); *Kottle*, 146 F.3d at 1060; *Potters Medical Center v. City Hosp. Ass'n*, 800 F.2d 568, 580-81 (6th Cir. 1986); *St. Joseph's Hospital, Inc. v. Hospital Corp. of America*, 795 F.2d 948, 955 (11th Cir. 1986); *Ottensmeyer v. Chesapeake & Potomac Tel. Co. of Md.*, 756 F.2d 986, 994 (4th Cir. 1985); *Israel v. Baxter Labs., Inc.*, 466 F.2d 272, 278 (D.C. Cir. 1972). But see *Armstrong Surgical Center, Inc. v. Armstrong County Mem'l Hosp.*, 185 F.3d 154, 160 (3d Cir. 1999) (calling into doubt existence of fraud exception).

No. 10-1665                                           15

Not every fraudulent misrepresentation during an adjudicative or administrative proceeding can give rise to antitrust liability, however. As the Supreme Court has explained, "the sham exception contains an indispensable objective component," *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 58 (1993), but also "depends on the existence of anticompetitive intent," *id.* at 57 n.4. In the context of the fraud exception, these requirements indicate that neither inadvertent misrepresentations, nor misrepresentations lacking any ascertainable effect on the proceedings in which they were made, are within the fraud exception's ambit.

For this reason, a misrepresentation renders an adjudicative proceeding a sham only if the misrepresentation (1) was intentionally made, with knowledge of its falsity; and (2) was material, in the sense that it actually altered the outcome of the proceeding. See *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 401-02 (4th Cir. 2001) (concluding that any fraud exception to *Noerr-Pennington* "extends only to the type of fraud that deprives litigation of its legitimacy"); *Cheminor Drugs*, 168 F.3d at 124 ("If the government's action was not dependent upon the misrepresented information, the misrepresented information was not material. . . . [Only] a *material* misrepresentation that affects the very core of a litigant's . . . case will preclude *Noerr-Pennington* immunity. . . ."); *Kottle*, 146 F.3d at 1060 ("litigation can be deemed a sham if a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy") (quotation omitted); *Potters*

*Medical Center*, 800 F.2d at 580 ("[K]nowingly false submissions or intentional misrepresentations constitute an abuse of government processes . . . . Only known falsity supports an antitrust offense.").[4] So formulated, the fraud exception closes a sizable loophole in the Supreme Court's definition of sham litigation, see *Professional Real Estate Investors*, 508 U.S. at 60-61—although successful petitioning activity may not, as a general matter, be deemed a sham, the fraud exception can remove that immunity if success is achieved by means of intentional falsehoods.

---

[4] The Supreme Court has not yet explicitly spoken as to "whether and, if so, to what extent *Noerr* permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations." *Professional Real Estate Investors*, 508 U.S. at 61 n.6. Nevertheless, both of the sources cited in that footnote—Fed. R. Civ. P. 60(b)(3) and *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965)—support this formulation of the fraud exception. See *id.* at 177 (concluding that proof that a party "obtained [a] patent by knowingly and willfully misrepresenting facts . . . would be sufficient to strip [that party of protection] from the antitrust laws"); *id.* at 179-80 (Harlan, J., concurring) (agreeing that antitrust liability may lie when a "patent is shown to have been procured by knowing and willful fraud" and when "monopolization [is] knowingly practiced under the guise of a patent procured by deliberate fraud"); *Walsh v. McCain Foods Ltd.*, 81 F.3d 722, 726 (7th Cir. 1996) (to obtain relief from a judgment under Rule 60(b)(3), moving party must show, among other elements, that because of fraud or misrepresentation "it was *prevented from fully and fairly presenting its case* at trial").

As noted, the fraud exception is based on the Supreme Court's desire to protect the integrity of non-political governmental proceedings. For that reason, the fraud exception contains, in addition to its substantive components, a threshold procedural component: the exception does not apply at all outside of adjudicative proceedings. See *Allied Tube*, 486 U.S. at 499-500 ("A publicity campaign directed at the general public, seeking legislation or executive action, enjoys antitrust immunity even when the campaign employs unethical and deceptive methods.") (citation omitted); *California Motor Transp.*, 404 U.S. at 513 (noting that misrepresentations are "condoned in the political arena"). "There is an emphasis on debate in the political sphere, which could accommodate false statements and reveal their falsity. In the adjudicatory sphere, however, information . . . is relied on as accurate for decision making and dispute resolving." *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1261 (9th Cir. 1982). As a result, fraudulent statements in the adjudicative context "threaten[ ] the fair and impartial functioning of these agencies and do[ ] not deserve immunity from the antitrust laws." *Id.* Recognizing this threshold procedural requirement, the district court in this case concluded that the fraud exception did not apply because the proceedings before the Village Board were legislative (*i.e.*, political) in nature. *Mercatus II*, 695 F. Supp. 2d at 821.[5]

---

[5]  In accord with the bulk of the case law using this terminology, we refer to all decision-making driven wholly or primarily

(continued...)

### 2. *Drawing the Line: Adjudicative or Legislative?*

On appeal, the parties focus their arguments on *Noerr-Pennington* almost entirely on whether the Board proceedings were legislative or adjudicative. But what makes a proceeding adjudicative or legislative for the purposes of the exceptions to *Noerr-Pennington*? The answer to this question is not as obvious as it might seem at first. Some proceedings—civil or criminal trials, for example—are, by their very nature, always adjudicatory. Other times, however, a governmental body will act in a legislative capacity in some cases but in an adjudicative capacity in others.

A legislature clearly acts in a political, legislative capacity when it contemplates the passage of a new law, for example, but the Supreme Court has indicated that a legislature might *also* act in an adjudicative capacity in certain circumstances, at least so far as *Noerr-Pennington* immunity is concerned. Compare *Allied Tube*, 486 U.S. at 504 (expressing doubt that "misrepresentations made under oath at a legislative committee hearing in the hopes of spurring legislative action" are protected under *Noerr-Pennington*), with *F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 424 (1990) ("It of course remains true that no violation of the [Sherman] Act can be predicated upon mere attempts to influence the

---

[5] (...continued)
by policy and political considerations as "legislative," fully cognizant of the fact that many such decisions are made by executive branches rather than legislatures.

passage or enforcement of laws." (quotation omitted)). Given the countless variations on state and federal agencies, it may often not be clear whether, in a given circumstance, an agency is acting legislatively, adjudicatively, or perhaps somehow even in both capacities simultaneously. See Daniel J. Davis, Comment, *The Fraud Exception to the Noerr-Pennington Doctrine in Judicial and Administrative Proceedings*, 69 U. Chi. L. Rev. 325, 333 (2002) (observing that "some federal statutes mandate that certain agencies use hybrid processes that combine legislative and adjudicatory procedures" and that administrative proceedings "can exhibit characteristics of both legislative and judicial actions"). The district court correctly observed that "the line between legislation and adjudication is not always easy to draw." *Mercatus II*, 695 F. Supp. 2d at 819 (quotation omitted).

In their briefs, the parties call to our attention only a single decision from this court discussing in any detail whether a proceeding was adjudicative or legislative for the purpose of applying the fraud exception to *Noerr-Pennington*. In *Metro Cable Co. v. CATV of Rockford, Inc.*, we considered whether a mayor and city council acted in a legislative or adjudicative capacity when they denied the plaintiff a franchise to construct and operate a cable television system. 516 F.2d 220, 222 (7th Cir. 1975). In so doing, we identified a number of characteristics indicating that the franchising decision was legislative rather than adjudicative.

First, we considered the general nature of the authority exercised by the mayor and city council. The council

possessed legislative power and, in fact, "the only way it [was] organized and equipped to act" was "as a legislative body." *Id.* at 228. The mayor, for his part, was "an executive officer with some legislative duties, which include[d] presiding over the city council and voting when the aldermen are equally divided." *Id.* Second, we considered the formality of the council's fact-finding processes. Unlike a court or other adjudicative body where evidence must satisfy strict rules of relevance and admissibility, the council did not "compile an evidentiary record through formal proceedings" and was "free to base its actions on information and arguments that come to it from any source." *Id.* Third, we considered the extent to which the fact-finding process was subject to political influences, noting that the council was "subject to lobbying and other forms of ex parte influence" that typify the legislative or political process. *Id.* Based on the totality of these factors, we concluded that the mayor and city council had acted in a legislative capacity, so the complained-of petitioning activity was immune from antitrust liability under *Noerr-Pennington*. *Id.*

The *Metro Cable* factors are not exclusive. A number of other factors may also prove helpful in determining whether a proceeding is adjudicative or legislative. Though perhaps encompassed by the *Metro Cable* factor regarding the formality of the fact-finding process, the Supreme Court has treated as significant whether any testimony at the proceeding in question was given under oath or affirmation, under penalty of perjury. See *Allied Tube*, 486 U.S. at 504 (questioning whether "misrepresentations made under oath" are protected

under *Noerr-Pennington*); *California Motor Transp.*, 404 U.S. at 512 ("[U]nethical conduct in the setting of the adjudicatory process often results in sanctions. Perjury of witnesses is one example."). An oath or affirmation backed by penalty of perjury should impress upon a witness the solemnity of the occasion and the importance of telling the truth, and should make clear that the witness is not "at liberty to exaggerate or color his version of an event," as might be possible in a more political or legislative setting. See, *e.g.*, *United States ex rel. Haywood v. Wolff*, 658 F.2d 455, 463 (7th Cir. 1981).[6]

In classifying proceedings as legislative or adjudicative for antitrust purposes, other courts have found significant whether the governmental actions at issue were matters of discretionary authority or were instead guided by more definite standards susceptible to judicial review. *Kottle*, 146 F.3d at 1062; *Boone v. Redevelopment Agency of San Jose*, 841 F.2d 886, 896 (9th Cir. 1988). The absence of definite standards is more characteristic of purely political or legislative activity than of adjudication. See *Franchise Realty Interstate Corp. v. San Francisco Local*

---

[6] We reject Mercatus' unsupported contention that a government proceeding is more likely to be adjudicative if a party is represented by legal counsel at that proceeding. After all, the presence or absence of counsel at a proceeding tells very little about the nature of the proceeding itself—a civil trial remains adjudicative regardless of whether a party appears *pro se*, and decision-making informed by lobbying is no less political merely because the lobby is represented by legal counsel.

*Joint Exec. Bd. of Culinary Workers*, 542 F.2d 1076, 1079 (9th Cir. 1976) (noting that precise standards "are simply absent from the rough and tumble of the political arena; almost any position, including the self-interested plea of one competitor that another should be denied a permit, may be urged before such a political body").[7]

---

[7] Mercatus argues that we should give significant weight to whether, in other contexts, the law treats the governmental activity at issue as legislative or adjudicative. We believe that such classifications, made for different purposes not connected to the First Amendment concerns underlying the *Noerr-Pennington* doctrine, are unlikely to be useful in applying that doctrine. Under Illinois law, for example, a hearing might be characterized as "legislative" for purposes of judicial review, see 65 ILCS 5/11-13-25 (making any decision regarding an application for a special use "subject to de novo judicial review as a legislative decision, regardless of whether the process in relation thereto is considered administrative for other purposes"), at the same time it is deemed "adjudicative" for the purpose of determining what process is due at that hearing, see *People ex rel. Klaeren v. Village of Lisle*, 781 N.E.2d 223, 234 (Ill. 2002) (deeming hearings concerning special use applications "administrative or quasi-judicial" for purposes of determining whether petitioners received due process, not because of political considerations but because "property rights are at stake"). See *Our Savior Evangelical Lutheran Church v. Saville*, 922 N.E.2d 1143, 1162 (Ill. App. 2009) (interpreting 65 ILCS 5/11-13-25 to address only "the mode of direct judicial review over the listed zoning decisions, not the application of due process to any of those . . . decisions") (quotation omitted).

Before applying these factors to the case now before us, however, we must note the significant constitutional concerns implicated by the fraud exception's application to petitioning activity. *Noerr-Pennington* was crafted to protect the freedom to petition guaranteed under the First Amendment. See, *e.g.*, *Premier Elec. Constr. Co.*, 814 F.2d at 371. This freedom has long been recognized as a cornerstone of democratic government itself. See *United Mine Workers of America, Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967) ("[T]he rights to assemble peaceably and to petition for a redress of grievances are among the most precious of the liberties safeguarded by the Bill of Rights."); *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937) ("The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances.") (quotation omitted); *McDonald v. Smith*, 472 U.S. 479, 486 (1985) (Brennan, J., concurring) (noting that, "except in the most extreme circumstances," the right to petition the government "cannot be punished . . . without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions") (quotation omitted).

Accordingly, we have recognized that the application of the sham exception might inadvertently stifle the legitimate exercise of this core right. *Havoco of America, Ltd. v. Hollobow*, 702 F.2d 643, 651 (7th Cir. 1983) (declaring that the fraud exception "cannot be used to chill [the] constitutional right" to "petition without fear of sanctions"); *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1345 (7th

Cir. 1977) (concluding, in context of civil rights suit, "that the real if peripheral chill of the right to petition which [the] knowing falsity rule could engender is significant enough for the First Amendment values to play a part in construing federal legislation"); see also *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 529-33 (2002) (considering First Amendment burden imposed by NLRB's effective expansion of the sham exception in labor cases); *Forro Precision, Inc. v. IBM Corp.*, 673 F.2d 1045, 1060 (9th Cir. 1982) (extending *Noerr-Pennington* to communications with law enforcement based on concern that a contrary ruling would discourage citizens from providing information to the police).

That risk grows when, as may often be the case, a layperson is uncertain whether the governmental action at issue is adjudicatory or legislative. See James M. Sabovich, *Petition Without Prejudice: Against the Fraud Exception to Noerr-Pennington Immunity From the Toxic Tort Perspective*, 17 Penn. St. Envtl. L. Rev. 1, 12 (2008) (observing that the "fact-specific" test used to determine "whether the proceeding is judicial, leave[s] the immunity for many petitions uncertain.") (footnote omitted). Such uncertainty may stem either from an unfamiliarity with the relevant legal principles due to a lack of legal counsel, or from a more basic unfamiliarity with the specific proceedings at issue. For example, a petitioner might not know that one municipal body, unlike its counterparts in other municipalities, forbids *ex parte* lobbying of its members, or she might simply be unaware that a prohibition on such lobbying has any legal significance for her petitioning activity.

Regardless of its source, the greater the uncertainty, the more likely that laypeople will hesitate to seek redress, out of fear that their petitioning activity will subject them to legal liability. Given the "broad spectrum of possibilities" implicated whenever a person contemplates engaging in legitimate First Amendment petitioning activity, a law's chilling effect is particularly great when it is unclear whether that law actually forbids the contemplated activity. See *Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010). Such chilling effect will be particularly pronounced when, as is the case with the antitrust laws, the allegedly fraudulent statements may be punishable by treble damages. That is not to say that any such chill would be confined to only that narrow class of petitioning activity forbidden by the antitrust laws, of course. After all, "*Noerr-Pennington* has been extended beyond the antitrust laws, where it originated, and is today understood as an application of the first amendment's speech and petitioning clauses." See *New West, L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007). For these reasons, we must ensure that we do not transform the Sherman Act into a means by which to chill vital conduct protected under the First Amendment. Cf. *Laird v. Tatum*, 408 U.S. 1, 11 (1972) (noting that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights").

Applying the factors we set out above, it is clear that the Village Board acted in a legislative capacity when it declined to approve the proposed Mercatus physician center. Like the city council in *Metro Cable*, the

Board generally acts in a policymaking capacity. The Board also appears ill-equipped to conduct adjudicative proceedings. It conducts the vast majority of its business through relatively informal public meetings and holds formal hearings only once a year regarding the Lake Bluff budget.

More specifically, the process by which the Board considered whether to grant Mercatus approval to develop the Shepard Land was decidedly legislative or political in nature. Both Mercatus and the Hospital engaged in *ex parte* lobbying of individual Board members prior to the hearings. Mercatus executives contacted or met personally with individual Board members, and at least one Board member even took a tour of Mercatus' facilities. A number of Lake Bluff residents also contacted the Board members to voice their views on the Mercatus project. This lobbying activity by advocates on both sides was perfectly legitimate, as would not be the case in an adjudicative proceeding. In fact, the lobbying was encouraged by the village president, who described the decision as "[e]ssentially . . . political" and preferred to give parties "the opportunity to lobby directly the trustees." Letchinger Dep. at 18, 20.

The processes by which the Board gathered information to guide its decision-making, unlike the processes in adjudicative proceedings, were decidedly informal. None of the evidence the Board considered was subject to strict rules of admissibility or any recognizable evidentiary rules, for that matter. At least one Board member, on his own initiative, contacted independent think tanks

for guidance. Members of the general public were allowed to voice their opinions regarding Mercatus' proposed site plan. None of the testimony before the Board was given under oath or on penalty of perjury.

The Board's decision on development approval was not guided by enforceable, definite standards subject to review.[8] The special use ordinance applicable to the

---

[8] We decline Mercatus' invitation to determine for ourselves whether the village's special use ordinance actually granted the Board broad authority to deny development approval. Mercatus had the opportunity to present this argument to the Zoning Board of Appeals, 65 ILCS 5/11-13-3(f); 65 ILCS 5/11-13-12, and then to the state courts on administrative review, 65 ILCS 5/11-13-13, but there is no indication in the record that Mercatus ever did so. Having eschewed that opportunity, Mercatus cannot now turn to the antitrust laws to avoid the consequences of that decision. The antitrust laws are designed to protect competition. They are not a guarantee of good government. See *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 378 (1991) (noting that the antitrust laws were not created to "vindicate[ ] . . . principles of good government"); *Noerr*, 365 U.S. at 140 ("Insofar as [the Sherman Act] sets up a code of ethics at all, it is a code that condemns trade restraints, not political activity. . . ."). And they certainly are not a license for the federal courts to displace the State of Illinois to sit in review of what is entirely a matter of local law. Cf. *City of Columbia*, 499 U.S. at 372 ("'We should not lightly assume that [the antitrust law] dictates transformation of state administrative review into a federal antitrust job.'"), quoting P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 212.3b, p. 145 (Supp.

(continued...)

Shepard Land required that the Board approve any additional development of that land, but the ordinance provided no standards governing the grant or denial of that approval. As several Board members recognized, this broad language gave the Board significant discretion whether or not to grant Mercatus approval to develop the Shepard Land.

The record thus shows beyond reasonable dispute that the proceedings before the Board were legislative in nature. It was, as the village president explained, "ultimately a political decision" not to grant Mercatus approval to develop the Shepard Land. Because the fraud exception does not apply to legislative proceedings, guided as they are by political considerations, *Noerr-Pennington* immunity applies. We need not address whether the Hospital's alleged misrepresentations rendered the Board proceedings a sham. The district court properly granted summary judgment for the Hospital on Mercatus' antitrust claims based on the Hospital's activities during the Village Board proceedings.

---

[8] (...continued)
1989). If Mercatus can invoke federal antitrust laws by claiming that the Village Board had no authority to reject Mercatus' site plan once the Architectural Board had approved it, and can thereby obtain a federal forum to review the merits of the Village Board's decision to reject the plan, "we cannot imagine what zoning dispute could not be shoehorned into federal court." *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 467 (7th Cir. 1988).

IV. *The Hospital's Public Relations Campaign*

Mercatus next argues that, even if *Noerr-Pennington* immunizes the Hospital's alleged misrepresentations directly to the Board, it does not apply to misrepresentations made to the public during the course of the Hospital's public relations campaign. We disagree.

A. *Facts on Summary Judgment*

To encourage Lake Bluff citizens to put political pressure on the Board, the Hospital launched a broad public relations campaign portraying Mercatus as a threat to "charity care and general health care services." As part of this campaign, the Hospital contacted its employees, physicians, and donors to warn them of the danger Mercatus posed to the Hospital's ability to provide care and encouraged them to contact Board members to voice their opposition to the Mercatus physician center. Hospital physicians also sent a letter, allegedly drafted by the Hospital's public relations consulting firm, to a local newspaper saying that the Mercatus center would offer services the Hospital already provided and urging Lake Bluff residents to ask the Board to reconsider its approval of the proposed Mercatus physician center.

B. *Public Relations Campaigns—A Necessary Corollary of Noerr-Pennington*

This public relations campaign, designed to encourage the public to urge the Board to disapprove Mercatus' plans

to develop the Shepard Land, is also sheltered by *Noerr-Pennington*. *Noerr* itself held that a public relations campaign to influence government action was beyond the reach of the Sherman Act. 365 U.S. at 140-42. As the Supreme Court has explained, a "publicity campaign directed at the general public, seeking legislation or executive action, enjoys antitrust immunity even when the campaign employs unethical and deceptive methods." *Allied Tube*, 486 U.S. at 499-500; see *id.* at 504 (stating that "rounding up supporters is an acceptable and constitutionally protected method of influencing elections").

Despite Mercatus' insistence to the contrary, the Hospital's public relations campaign does not lose its protection even if it caused Mercatus injury unrelated to the Board's denial of development approval. "It is inevitable, whenever an attempt is made to influence legislation by a campaign of publicity, that an incidental effect of that campaign may be the infliction of some direct injury upon the interests of the party against whom the campaign is directed." *Noerr*, 365 U.S. at 143; see *id.* at 144 ("Inherent in [fights between competitors], which are commonplace in the halls of legislative bodies, is the possibility, and in many instances even the probability, that one group or the other will get hurt by the arguments that are made."). All but the most stunningly unsuccessful public relations campaigns will persuade at least *some* members of the public. Those individuals may, in turn, refuse or hesitate to do business with the target, causing that target some injury despite the government's refusal to act. Such injuries are inevitable whenever a business attempts to rally the public to encourage government

action that will adversely affect one of its competitors. To make such injuries from public relations campaigns actionable under the antitrust laws would "be tantamount to outlawing all such campaigns." *Id.* at 143-44. That would greatly limit people's ability to rally public support to their causes, thereby limiting the ability of all but the most powerful and influential individuals to petition effectively for redress. Such an invasive regulation of the political process "has not been done by anything in the Sherman Act." *Id.* at 144.[9] Summary judgment for the Hospital regarding its public relations campaign was correct as a matter of law.

## V. *The Hospital's Derogatory and Territorial Communications*

Mercatus also argues that a number of statements the Hospital made outside of its public relations campaign violated the antitrust laws because they impaired Mercatus' ability to compete with the Hospital.

---

[9] Our statement in *Premier Electric* that, "if . . . injury occurs no matter how the government responds to the request for aid—then we have an antitrust case," 814 F.2d at 376, should not be construed to the contrary or as conflicting with *Allied Tube* or *Noerr.* Our statement addressed only those circumstances in which a party imposes an unlawful restraint of trade, such as a boycott, as part of a larger attempt to petition the government. See *id.* (noting that the defendant's petitioning activity was "an unvarnished effort to enforce a private price-fixing agreement").

### A.  *Facts on Summary Judgment*

In addition to its public relations campaign against Mercatus, the Hospital also allegedly communicated with other businesses to make it more difficult for Mercatus to enter the Lake Bluff market. For example, the Hospital contacted Mercatus' business partner ENH to question why it would support a physician center "that was ideally designed to lure [away] physicians that were aligned with the hospital," and to warn ENH to stay out of Lake Bluff. A Hospital employee also contacted other health care providers to discuss Mercatus' CEO's rude treatment of her during her visit to Mercatus' Vernon Hills facility and to warn them of the competitive threat Mercatus posed to their business. Mercatus also alleges that the Hospital made false statements asserting "that Mercatus was not in compliance with federal anti-kickback regulations."

### B.  *"Mere" Speech and the Law of Antitrust*

Unlike the Hospital's public relations campaign, we see no discernible connection between any of these communications and the proceedings before the Board; as a result, they are simply outside *Noerr-Pennington*'s reach. See *MCI Communications Corp. v. Am. Tel. & Telegraph Co.*, 708 F.2d 1081, 1159 (7th Cir. 1983) ("The *Noerr-Pennington* doctrine is concerned solely with the right to attempt to influence government action."). That is not to say, of course, that these statements are necessarily actionable in antitrust. To resolve that particular question, we must consider the precise speech at issue here.

1. *The Hospital's Warning to ENH*

We first turn to the Hospital's warning that ENH stay out of the Hospital's territory. Under circuit precedent, such a territorial admonition to a competitor—like other speech made in the commercial context—does not violate the antitrust laws unless it leads to an agreement to restrain trade or is accompanied by some sort of "enforcement mechanism" designed somehow to coerce or compel that competitor to heed the admonition. See *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623 (7th Cir. 2005) (affirming summary judgment against antitrust claim based on allegedly defamatory statements, due to lack of "an enforcement mechanism"); *Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d 397, 400 (7th Cir. 1989) ("Without [an enforcement mechanism] there is only uncoordinated individual action, the essence of competition.").

We find nothing in the record to indicate that the Hospital's warnings to ENH were backed by any sort of coercive conduct that might give rise to antitrust liability. The Hospital did not threaten to spearhead a boycott of ENH's services or to have ENH's suppliers withhold medical supplies if it entered Hospital territory. See *Schachar*, 870 F.2d at 399 (noting that boycotts and agreements not to distribute certain products are the types of enforcement mechanisms that may render speech actionable under the antitrust laws). Nor did the Hospital possess any inherent authority that it could leverage to compel ENH to stay out of Lake Bluff. See *id.* at 398 (finding significant that defendant had "no authority

over hospitals, insurers, state medical societies or licensing boards, and other persons who might be able to govern the performance of surgery"). Regardless of what the Hospital said, ENH was free to choose for itself whether to compete close to the Hospital.

Put simply, all the Hospital did was say aloud what every business already thinks about its competitors: stay out of my territory. See *Olympia Equip. Leasing Co. v. W. Union Telegraph Co.*, 797 F.2d 370, 379 (7th Cir. 1986) ("Most businessmen don't like their competitors, or for that matter competition."). Such a statement, absent an agreement or any coercive enforcement mechanisms to back it up, is simply not actionable under the Sherman Act.

### 2.  *The Hospital's Derogatory Comments About Mercatus*

We next turn to the remainder of the Hospital's communications, all of which served to disparage either Mercatus itself or the services it offered. Like the Hospital's territorial admonitions to ENH, these statements were not backed by threats designed to coerce acceptance of the Hospital's views about Mercatus. See *Sanderson*, 415 F.3d at 623; *Schachar*, 870 F.2d at 400. As a result, this speech can be compared to a kind of commercial speech familiar to all: advertisements. Like an advertisement (think of Apple's long-running "Mac vs. PC" commercials, for example), the Hospital's statements implicitly touted the Hospital's strengths while calling into question the wisdom of doing business with Mercatus. As a general matter, such statements are outside the reach of the antitrust laws, however critical they

may be of a competitor's product or business model. "Antitrust law does not compel your competitor to praise your product or sponsor your work. To require cooperation or friendliness among rivals is to undercut the intellectual foundations of antitrust law." *Id.* at 399.

This analysis holds true even if the Hospital's statements about Mercatus were false. As we recognized in *Sanderson*, even false statements about a competitor serve to "set the stage for competition." 415 F.3d at 623. If the Hospital falsely claimed that Mercatus would drive local community-based hospitals out of business, for example, Mercatus could respond with information to refute that claim. If the Hospital falsely claimed that Mercatus violated anti-kickback regulations, Mercatus could respond with facts indicating the falsity of that claim.[10] By engaging in this process, Mercatus could have derived a distinct competitive *advantage*: a falsehood, when exposed, will likely "generate bad will toward the firm by which [the public] was misled." *Covad Communications Co. v. Bell Atlantic Corp.,* 398 F.3d 666, 674 (D.C. Cir. 2005).

The genuine anticompetitive effects of false and misleading statements about a competitor are minimal, at best. Although false statements about a rival "can [theoretically] obstruct competition on the merits," it is difficult to identify those "false statements on which

---

[10] Mercatus claims that, "in [its] substantially weakened state . . . [it] did not have the luxury of more speech," but we fail to see how it was rendered unable to speak.

buyers do, or ought reasonably to, rely." 3 P. Areeda & D. Turner, *Antitrust Law*, ¶ 737b at 280-81 (1978), quoted in *American Prof'l Testing Service, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997). Many consumers will "recognize disparagement as non-objective and highly biased." *Id.* As a result, courts must exercise "caution . . . against attaching much weight to isolated examples of disparagement," and claims based on one competitor's disparagement of another "should presumptively be ignored." *Id.* Recognizing these concerns, other circuits have concluded that the anticompetitive effects of false speech are presumptively minimal. See, *e.g.*, *American Council of Certified Podiatric Physicians & Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 370 (6th Cir. 2003); *American Prof'l Testing Service*, 108 F.3d at 1152; *National Ass'n of Pharmaceutical Mfrs. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988).

As we said in *Sanderson*, absent an accompanying coercive enforcement mechanism of some kind, even demonstrably false "[c]ommercial speech is not actionable under the antitrust laws." 415 F.3d at 624; see *Schachar*, 870 F.2d at 400 (noting that, whenever one competitor's statements about another are "false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech—the marketplace of ideas"); cf. *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526-27 (1983) (observing that even conduct that might constitute "common-law fraud or deceit" is "plainly not subject to review under the federal antitrust laws").

To the extent that a falsehood results in some harm to a competitor, that is a matter better suited for the laws against unfair competition or false advertising, not the antitrust laws, which are "concerned with the protection of competition, not competitors." *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 298 (7th Cir. 1974) (quotation omitted); see *Northwest Power Products, Inc. v. Omark Indus., Inc.*, 576 F.2d 83, 88 (5th Cir. 1978) ("The thrust of antitrust law is to prevent restraints on competition. Unfair competition is still competition and the purpose of the law of unfair competition is to impose restraints on that competition."). "Some other law may require judicial intervention in order to increase the portion of truth in advertising; the Sherman Act does not." *Sanderson*, 415 F.3d at 624.

Neither the Hospital's territorial comments nor its alleged derogatory statements about Mercatus are a valid basis, whether considered alone or in conjunction with the Hospital's other complained-of conduct, for an antitrust claim. The district court correctly granted summary judgment for the Hospital regarding these matters.

## VI. *The Hospital's "Physician Strategy"*

Thus far, we have determined that the bulk of the Hospital's complained-of conduct is either (1) petitioning activity immune from antitrust liability under *Noerr-Pennington;* or (2) speech that falls outside the scope of the antitrust laws. The only remaining issue to warrant discussion relates to the Hospital's "physician strat-

egy"—its attempts to convince certain Hospital-
affiliated physician practice groups not to relocate their
practices to the Mercatus physician center.


A.  *Facts on Summary Judgment*

Beginning in 2004, Mercatus approached a number of
physicians to discuss relocating their practices to its
proposed physician center. By May 2006, a number of
Hospital-affiliated physicians had conditionally
accepted offers to relocate to the physician center.
Fourteen of the seventeen physicians whom Mercatus
recruited were on the Hospital's staff, and six of that
number were tenants of Hospital office space. In par-
ticular, two physician practice groups, North Suburban
Medical Associates ("NSM") and Lake Forest Medical
Associates ("LFM"), agreed to move their practices to
the Mercatus physician center if Mercatus met certain
contractual milestones. As part of those agreements,
those practice groups signed "no-shop" agreements
that forbade them from pursuing or entertaining a "con-
tractual relationship or other agreement with any other
entity or person engaged in a business similar to
[Mercatus]."

The Hospital wanted these physician groups—signif-
icant revenue producers important to the Hospital—to
get out of their deals with Mercatus. To do so, the Hos-
pital offered a number of incentives to NSM and LFM to
entice them not to relocate to the proposed Mercatus
physician center. The Hospital offered to assume NSM's

office lease and then to sublease a more manageable portion of that space back to NSM, to help NSM negotiate a lease extension from its landlord, and to make NSM a partner in the development of an electronic medical records interface—essentially "the same things that Mercatus had agreed to provide." The Hospital also offered LFM a chance to partner with the Hospital in developing an electronic medical records system, as well as a subsidy to implement that system in LFM's of-fices. The Hospital also announced that it would freeze LFM's lease rate and offered to provide LFM assistance in recruiting a new physician to its practice.[11] Allegedly, the Hospital also falsely told these physicians that Mercatus had violated certain anti-kickback regulations. Both NSM and LFM eventually terminated their rela-tionships with Mercatus, but the Hospital has followed through on only some, but not all, of its offers to those practice groups.

## B.  *Lack of Evidence of Predatory Conduct*

On appeal, Mercatus argues that this conduct was not protected by *Noerr-Pennington* and was not (as the district court concluded) mere speech outside the scope

---

[11] Mercatus claims that the Hospital also promised the physician groups "equity in [the Hospital's] real estate." Nothing in the portions of the record relied on by Mercatus supports this contention. At most, the record indicates that the Hospital was considering whether to offer the physician groups such an equity option.

of the antitrust laws. Although we agree with Mercatus on both points, Mercatus has failed to present sufficient evidence that the Hospital's actions constituted actual or attempted monopolization under the Sherman Act. See *Professional Real Estate Investors*, 508 U.S. at 61 (noting that "even a plaintiff who defeats [a] defendant's claim to *Noerr* immunity . . . must still prove a substantive antitrust violation" ). To prove actual monopolization of a market, Mercatus must show (1) that the Hospital possessed monopoly power in that market; and (2) that the Hospital willfully acquired or maintained that power by means other than the quality of its product, its business acumen, or historical accident. *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427, 430 (7th Cir. 1980). To prove attempted monopolization, Mercatus must show (1) the Hospital's specific intent to achieve monopoly power in a relevant market; (2) predatory or anticompetitive conduct directed to accomplishing this purpose; and (3) a dangerous probability that the attempt at monopolization will succeed. *Lektro-Vend Corp. v. The Vendo Co.*, 660 F.2d 255, 270 (7th Cir. 1981). The second element of each claim can be met by showing that the Hospital engaged in predatory or anticompetitive conduct of some kind. See *Chillicothe Sand & Gravel*, 615 F.2d at 430; *American Academic Suppliers, Inc. v. Beckley-Cardy, Inc.*, 922 F.2d 1317, 1320 (7th Cir. 1991) ("The offense of monopolization is the acquisition of monopoly by improper methods or, more commonly . . . the *abuse* of monopoly, the latter occurring for example when a monopolist by pricing below cost succeeds in repelling or intimidating new entrants or

extending his monopoly into new markets."); *State of Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.*, 935 F.2d 1469, 1481 (7th Cir. 1991) ("Section 2 forbids not the intentional pursuit of monopoly power but the employment of unjustifiable means to gain that power.").

Turning to Mercatus' submissions to this court, we see little to indicate *why* the Hospital's actions might be considered anticompetitive or predatory. This issue is never really addressed in Mercatus' opening brief, which focuses primarily on arguing that *Noerr-Pennington* immunity does not apply. And Mercatus' bare claim that the Hospital's conduct "prevented [Mercatus'] entry and reduced competition" simply does not suffice. After all, many kinds of conduct may prevent or discourage a potential competitor from entering a particular market. Federal antitrust laws are implicated only when that conduct is predatory or unjustifiable. See, *e.g.*, *Burris*, 935 F.2d at 1481 ("Section 2 forbids not the intentional pursuit of monopoly power but the employment of unjustifiable means to gain that power.").

To the extent that Mercatus addresses this issue, it only further muddies what are already murky waters. Its reply brief argues that the Hospital "tortiously violated Mercatus' no-shop agreements." The Hospital was not party to those agreements and could not breach a contract to which it was not a party. Assuming that Mercatus meant to say that the Hospital tortiously interfered with its contractual relationships with the physicians, an allegation that the Hospital acted "tortiously" does little to advance Mercatus' argument. The

antitrust laws are designed to protect competition, while business tort law is generally designed to protect the competitors themselves. See, *e.g.*, *American Council of Certified Podiatric Physicians & Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 372 (6th Cir. 2003) ("Isolated business torts . . . do not typically rise to the level of [an antitrust] violation unless there is a harm to competition itself.").[12] For the Hospital's alleged interference to have violated the antitrust laws, then, its specific acts of interference must have had a negative effect on competition. The problem is, any interference with the no-shop agreements was arguably *pro-competitive* to at least some extent, given that the no-shop agreements were designed to prevent the Hospital or anyone else from competing for the physicians of LFM and NSM. That remains true whether or not the Hospital, which was admittedly aware of the no-shop agreements' existence, actually knew the substance of those agreements.

---

[12] We agree with the Hospital that Mercatus' claim appears somewhat akin to a breed of antitrust violation recognized in the Ninth Circuit as "predatory hiring." "Unlawful predatory hiring occurs when talent is acquired not for purposes of using that talent but for purposes of denying it to a competitor." *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990) (addressing "the first reported case of a claimed violation of section 2 as a result of alleged employee raiding or predatory hiring"). We have never recognized predatory hiring as a valid theory of antitrust liability and need not do so at this time since Mercatus has said it does not assert a predatory hiring claim.

No. 10-1665                                    43

To show that the Hospital's "physician strategy" violated the antitrust laws, Mercatus had to present evidence that the Hospital engaged in some anticompetitive conduct in addition to its alleged interference with the no-shop agreements. To that end, Mercatus alleges that the Hospital falsely implied that Mercatus was in violation of anti-kickback regulations, but we have already concluded that statements of this sort are either pro-competitive or have, at best, a minimal anticompetitive effect. Setting aside that alleged false statement, we just cannot see any reason to be troubled by the manner in which the Hospital went about convincing these physicians not to move their practices to Mercatus' physician center. The Hospital did not leverage its market power to make the physicians offers on supra-competitive terms impossible for any competitor to match. The Hospital simply offered the physicians many of the same incentives Mercatus offered to induce them to relocate their practices in the first place. Nor is there any evidence that the Hospital resorted to unfair or coercive tactics, such as threats to revoke the physicians' Hospital staff privileges if they relocated to Mercatus' physician center.[13]

To the extent that Mercatus tries to argue that the Hospital, in the course of making its offers, "exerted

---

[13] In his deposition testimony, Mercatus' CEO implied that the Hospital threatened to make public one physician's "personal conduct issue" if that physician continued to support Mercatus. If true, this would be troubling, but the physician denied that the Hospital ever made such a threat. No admissible evidence supports Mercatus' allegation.

extreme pressure" on the physicians, this argument founders for two reasons. First, the evidence indicates that at least some of the "pressure" of which Mercatus complains was not exerted by the Hospital but was an indirect result of the Hospital's public relations campaign. According to Mercatus' own CEO's deposition testimony, the Hospital's "misinformation in communicating with all constituents . . . sullied the entire physician market" for Mercatus. For example, one key physician felt "ostracized from the . . . community because . . . of his support of the project in the face of the hospital's objections." Another physician was "fairly shaken" by "buzz in the community." But such community reaction was the inevitable result of the Hospital's robust public relations campaign. We have already explained that the public relations campaign falls under the protection of *Noerr-Pennington*.

Second, to whatever extent the Hospital directly exerted pressure on LFM and NSM to remain with the Hospital, the Hospital had good competitive reason to do so. Mercatus readily admits that it was trying to lure away from the Hospital a group of doctors with "a critical mass" of more than 30,000 patients. The loss of this many patients was apparently fatal to Mercatus' plans to build a physician center anywhere in Lake Bluff. The effects of such a loss on the Hospital would undoubtedly have been significant as well. It is not troubling, then, that the Hospital made an extraordinary effort to retain these physicians (and, through them, the

revenue from treating their patients).[14] And even if such efforts were somewhat aggressive or heavy-handed, the antitrust laws do not prohibit "conduct that is only unfair, impolite, or unethical." *Schachar*, 870 F.2d at 400 (citation omitted).

We also see nothing predatory or anticompetitive in the fact that the Hospital failed to follow through with a few of the promises it made to convince these practice groups not to relocate to the Mercatus physician center. For starters, we reject Mercatus' economic expert's attempt to argue that *any* failure to keep a promise—apparently, regardless of the reason for that failure—is anticompetitive. If that were the case, even the most mundane breach of contract could violate the antitrust laws. Lest we transform every inadvertent failure to keep a commercial promise into an antitrust violation, we conclude that the Hospital's conduct can be considered predatory only if its promises were made not to compete in the market, but only to unfairly stymie unwanted competition.

That might be the case if, for example, it could be shown that the Hospital's promises were made with no intent of ever being kept, or if the Hospital's promises were broken only after the Hospital realized that

---

[14] It is questionable whether the Hospital even exerted such pressure. During his deposition, a physician with NSM made quite clear that he did not feel any pressure from the Hospital, which he said had "offered another opportunity that I couldn't explore while I was under the no-shop" agreement.

Mercatus' competitive threat had passed. But nothing in the record, even when viewed in the light most favorable to Mercatus, indicates that this was the case. The evidence shows only that the Hospital fulfilled some but not quite all of the promises it made to each physician group. NSM agreed to partner with the Hospital to develop an electronic medical records system. NSM has not yet signed a contract to purchase that system, though it has expressed "verbal intent" to do so. And though the Hospital helped NSM obtain an extension of its office lease, the Hospital has neither assumed that lease nor subleased a portion of the office space thereunder back to NSM. The Hospital froze LFM's lease rate as promised, but has not yet provided the promised recruitment assistance to LFM, apparently because LFM never recruited another physician. As a result, we have, at best, a claim for breach of contract by the physicians against the Hospital (or perhaps a claim for promissory estoppel), not an antitrust case by Mercatus.

Because of the potential chill that antitrust litigation can have on legitimate pro-competitive practices, see *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986), Mercatus was obliged, in opposing the Hospital's motion for summary judgment, to "present evidence that tends to exclude the possibility that the [Hospital's] conduct was as consistent with competition as with illegal conduct." *Nelson v. Monroe Reg'l Med. Center*, 925 F.2d 1555, 1578 (7th Cir. 1991) (quotation omitted). Despite this burden, Mercatus appears to merely complain that the Hospital had the audacity to try to retain the business of the physicians through

whom Mercatus admittedly sought to draw substantial income away from the Hospital. But this is an example of the very type of competition the antitrust laws were designed to protect. It would be perverse if Mercatus' failure to prevail *in that competition* gave it a grievance cognizable under the Sherman Act. Even if the Hospital had monopoly power in the geographic and product markets Mercatus' economic expert endorsed, the Hospital had no duty to step aside and allow Mercatus to make off with its physicians, patients, and revenue. Cf. *Olympia Equip. Leasing*, 797 F.2d at 379 ("Consumers would be worse off if a firm with monopoly power had a duty to extend positive assistance to new entrants, or having extended it voluntarily a duty to continue it indefinitely."). Nothing in the voluminous record could enable any reasonable finder of fact to render a verdict for Mercatus regarding the Hospital's pursuit of these two physician practice groups.

VII. *Conclusion*

In the end, the vast majority of the conduct of which Mercatus complains was a legitimate exercise of the Hospital's right to petition the government for redress, regardless of how dishonest or distasteful that conduct might have been. None of the remaining complained-of conduct—competition for key physicians, empty territorial statements to a competitor, and false derogatory statements about Mercatus—gives rise to liability under the antitrust laws, whether considered in isolation or taken together as a whole. To the extent Mercatus

48                                  No. 10-1665

was harmed by the Hospital's actions, any remedies might arise under Illinois tort law, not federal antitrust law. The judgment of the district court is AFFIRMED.